**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>       v.<br><br>JEREMY SHANE MARBLE,<br><br>                    Defendant. | Case No. 19-cr-01787-BAS-18<br>Case No. 22-cv-01171-BAS<br><br>**ORDER DENYING DEFENDANT'S:**<br><br>(1) **MOTION FOR WRIT OF HABEAS CORPUS (ECF No. 1938); AND**<br><br>(2) **MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255 (ECF No. 1939)** |

Defendant was involved with a large drug distribution organization supplying methamphetamine, heroin, and gamma-hydroxybutyrate (GHB) throughout the United States and the United Arab Emirates. (Presentence Report ("PSR") ¶¶ 4–16, ECF No. 1406.) He pled guilty to three counts: one count of conspiracy to distribute methamphetamine, one count of conspiracy to launder money, and one count of possession of methamphetamine with intent to distribute—an offense committed

while he was on pretrial release for the first two counts. (ECF Nos. 1214–1219, 1234.) The Court sentenced Defendant to 120 months concurrent on Counts One and Two and 30 months on Count Three consecutive to the 120 months. (ECF No. 1701.)

Defendant now brings a Motion for Writ of Habeas Corpus and a Motion to Vacate his Conviction and Sentence pursuant to 28 U.S.C. § 2255. (ECF Nos. 1938, 1939 ("Motion").) Defendant argues that his counsel was ineffective because: (i) he failed to adequately investigate and uncover exculpatory evidence; and (ii) he failed to ensure that Defendant's guilty plea was knowing, voluntary, and intelligent. (*Id.*) The Government opposes (ECF No. 1950 ("Opposition")), and Defendant files a Traverse (ECF No. 1952). For the reasons stated below, the Court **DENIES** Defendant's Motion.

I.  BACKGROUND

    A.  Offenses

As Defendant admits in his moving papers, he worked closely with one of the leaders of the drug trafficking organization, Teters, and helped him to both distribute methamphetamine and launder money. (Motion.) Specifically, Drug Enforcement Agency Agents intercepted Defendant discussing a five-pound methamphetamine transaction with Teters on a wiretap. (PSR ¶ 21.) On November 8, 2018, Agents then stopped Defendant in the Portland Airport and seized 3,057 grams of methamphetamine from his duffel bag. (*Id.*) After the seizure, Agents intercepted codefendants Teters and Seymour discussing the seizure. (*Id.*)

Defendant was also tied to a November 20, 2018, seizure of 3,583 grams of methamphetamine and $5,600. (PSR ¶ 22.) Agents intercepted Defendant discussing the delivery of multiple pounds of methamphetamine with Teters before the seizure. (*Id.*)

With respect to money laundering, PayPal records showed Defendant sent six transfers to Teters for $3,750 from February to May of 2018. (PSR ¶ 17.) Bank of America records reflect Defendant had eleven cash deposits totaling $19,193 from

June to November 2017 and Defendant had $20,000 in deposits from Western Union and Money Gram between June and November 2018. (*Id.*)

After being arrested for the above conduct, Defendant was released on pretrial supervision. He failed to enter drug treatment and failed to report to Pretrial Services as directed. (PSR ¶ 33.) Instead, he was arrested by California Highway Patrol officers driving under the influence of drugs. (PSR ¶ 34.) During this second arrest, CHP found bags containing four pounds of methamphetamine in Defendant's car. (ECF Nos. 725–726.)

Defendant has a lengthy criminal record, none of which counted in calculating his criminal history category because of the age of the convictions. At age 27, Defendant was charged with manufacturing or delivering a controlled substance and he pled guilty to possession of methamphetamine. (PSR ¶ 60.) At age 28, Defendant was convicted four more times of unlawful possession of methamphetamine. (PSR ¶¶ 61–62.) Throughout his post-offense supervision in those cases, he repeatedly tested positive for methamphetamine. (PSR ¶ 64.)

**B.    Guilty Plea**

Defendant pled guilty to Count One—conspiracy to distribute methamphetamine, Count Two—conspiracy to launder money, and Count Three—possession of methamphetamine with intent to distribute committed while on pretrial release. (ECF Nos. 1214–1219, 1234.) In a written plea agreement, initialed on each page and signed by Defendant, Defendant recognized that he was facing a mandatory minimum sentence of ten years and a maximum sentence of life in custody. (Plea Agreement § III.A., ECF No. 1209.) Defendant also recognized that because he committed a crime while on pretrial release, he now faced "a mandatory additional penalty of no more than ten years in prison which must be served consecutive to any other sentences for other offenses." (*Id.*) Defendant signed that he "has consulted with counsel and is satisfied with his counsel's representation." (Plea Agreement § XV.)

At his Change of Plea, Defendant confirmed that, before initialing and signing the above Plea Agreement, he had read it or had it read to him in its entirety and had no questions about anything that was in it. (Change of Plea Tr. 7:15–22, ECF No. 1850.) The Magistrate Judge advised Defendant that he was facing ten years to life in custody on Counts One and Two and a mandatory additional maximum of ten years on Count Three. Defendant said he understood those were the maximum penalties. (*Id.* 9:15–10:12.)

When Defendant said he was not clear on the sentencing guidelines, the Magistrate Judge gave him time to talk some more with his lawyer, after which he stated, "Okay. We're good." (Change of Plea Tr. 11:17–12:16.) Defendant told the Magistrate Judge that he understood the sentencing guidelines were advisory only, that the sentencing judge did not have to follow those guidelines, and that the judge could impose the maximum penalty as described. (*Id.* 12:25–13:5.)

Defendant told the Magistrate Judge that he had reviewed the factual basis in the Plea Agreement and that it was true. (Change of Plea Tr. 15:8-9.) In the factual basis, Defendant admitted he "worked as a methamphetamine distributor for a Southern California based drug trafficking organization . . . . to distribute multi-pound quantities of methamphetamine in the San Diego, California and Portland, Oregon areas." (Plea Agreement § II.B, Count One ¶ 4.) He admitted that on November 8, 2018, he had 3,057 grams of methamphetamine in the Portland Airport, which he had obtained from Teters and which he intended to distribute in Portland. (*Id.* ¶ 5.) He agreed that agents had seized $15,450 in cash from his residence, which was "proceeds of [his] drug distribution activities." (*Id.*, Count One ¶ 6.) Defendant admitted he "personally conducted financial transactions with the proceeds of drug trafficking activities." (*Id.*, Count Two ¶ 6.) Finally, Defendant admitted that while on pretrial release, he possessed an additional 1,990 grams of actual methamphetamine. (*Id.*, Count 3 ¶ 1.)

Finally, the Magistrate Judge asked Defendant if he had any questions whatsoever about the sentencing guidelines, how they applied to him, or his case. (Change of Plea Tr. 13:15–18.) Defendant said he did not. (*Id.*)

**C.     Sentencing**

Before Sentencing, Defendant was given the opportunity to tell his story to the Probation Officer. (PSR ¶¶ 35–39.) Defendant claimed his drug abuse led him to make bad decisions and to associate with people he never would have otherwise. (*Id.*) Defendant told the Probation Officer he "deserved to be here. It ruined my life and it could have ruined other lives. I regret it. I am responsible." (PSR ¶ 39.)

The Probation Officer preparing the PSR reported to the Court that Defendant was diagnosed with ADHD and relapsed on methamphetamine when he began to take Adderall. (PSR ¶ 102.) And the Probation Officer detailed Defendant's work as a union member ironworker. (PSR ¶ 108.) Probation calculated Defendant's sentencing guidelines range as 292 to 365 months but recommended 120 months in custody on Counts One and Two, as well as a consecutive 36 months in custody on Count Three, for a total of 156 months of custody. (PSR ¶¶ 161–62.)

In a Sentencing Memorandum, defense counsel argued that Defendant was an addict who had played a minor role in the conspiracy. (ECF No. 1700.) Defense counsel said Defendant was simply working for himself to feed his own addiction. (*Id.*) Defense counsel also stated that Defendant had maintained a 40 to 60 hour job working for the Ironworkers Union and was a family man. (*Id.*)

At Sentencing, defense counsel argued that Defendant had worked for twenty years as a longshoreman and was a "law-abiding, hard-working construction worker" who had raised a family. (Sentencing Tr. 4:6–10, ECF No. 1865.) Defense counsel pointed to the pictures he had submitted of Defendant on top of roofs and of hangars at various military installations Defendant had been involved in building. (*Id.*) Defense counsel asked the Court to take into consideration that the case had been difficult to move forward because of COVID-19. (*Id.* 10:23–12:1.) At allocution,

Defendant corrected his lawyer and said, "It's the Ironworkers, not Longshoremen, but it doesn't really matter I don't think." (*Id.* 13:24–14:1.) Defendant provided a statement to the Court detailing his struggles with ADHD and his attempts to get medication. The Court read and took this statement into consideration at sentencing. (*Id.* 2:16–2:42.)

## II.  ANALYSIS

### A.  Standard

"[A] defendant who pleads guilty upon the advice of counsel may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was ineffective." *Lambert v. Blodgett*, 393 F.3d 943, 979 (9th Cir. 2004) (quoting *Hill v. Lockhart*, 474 U.S. 52, 56–57 (1985)). Even in a claim of ineffective assistance of counsel in a guilty plea, the defendant must meet the *Strickland* test; that is, he must show, first, "that counsel's assistance was not within the range of competence demanded of counsel in criminal cases," and, second, that he suffered actual prejudice as a result of this incompetence. *Lambert*, 393 F.3d at 979–80; *Hill*, 474 U.S. at 57–58.

"A deficient performance is one in which counsel made errors so serious that []he was not functioning as the counsel guaranteed by the Sixth Amendment." *Iaea v. Sunn*, 800 F.2d 861, 864 (9th Cir. 1986) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Review of counsel's performance is highly deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation." *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1253 (9th Cir. 1987). The court should not view counsel's actions through "the distorting lens of hindsight." *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995) (quoting *Deutscher v. Whitley*, 884 F.2d 1152, 1159 (9th Cir. 1989)).

To satisfy the second "prejudice" prong in a guilty plea case, "defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. In

evaluating prejudice, courts may freely discredit a defendant's claim that he would not have pleaded guilty absent erroneous advice by looking at "the plea agreement and the . . . district court's plea canvass" to see whether they "alerted [the defendant] to the potential consequences of his guilty plea." *Womack v. Del Papa*, 497 F.3d 998, 1003 (9th Cir. 2007) (citations omitted); *see also United States v. Garcia*, 909 F.2d 1346, 1348 (9th Cir. 1990) (noting an erroneous sentencing prediction "does not entitle a defendant to challenge his guilty plea").

      **B.**     **Failure to Investigate**

Defendant argues his counsel was ineffective when he failed to investigate and discover: (1) Defendant "was only tangentially involved [in the drug conspiracy] for personal, and not business, reasons, and only associated with Teters"—not the other members of the conspiracy (Motion at 19); (2) the quantities of methamphetamine and money with which Defendant was involved were "insignificant in light of the extensive operation as a whole" (Motion at 20); (3) Defendant's relationship with Teters was a friendly one, not a "cold, calculating business" relationship; (4) Defendant was working as an ironworker at the time, which indicates he "did not sell drugs as a way to sustain himself, as typical drug dealers do" and Defendant was working diligently at the time and was a family man (Motion at 21); and (5) Defense counsel failed to hire a fingerprint expert to show Defendant never handled the drugs, which "would have established [his] minimal involvement" in the drug conspiracy (Motion at 22).

Additionally, Defendant argues he had to use his allocution time to correct counsel's errors: counsel misstated Defendant's age as 50 when he was only 49 and counsel misstated that defendant was a longshoreman when, in fact, he was an ironworker. (Motion at 23.) Finally, Defendant claims his counsel failed to ascertain how much Defendant's mental health conditions, that is, his ADHD "affected his ability to form the requisite intent required for conviction." (Motion at 25.)

Clearly, counsel did investigate many of these issues. Defense counsel argued at sentencing that Defendant was only a minor player in the conspiracy, who was involved only because he was an addict. Defense counsel also argued that Defendant had worked hard as an ironworker and was a family man. Thus, to the extent Defendant is arguing defense counsel failed to investigate and discover these facts, he is incorrect. Counsel was aware of them and argued them to the Court at the time of sentencing.

Additionally, Defendant is unable to show that any of these issues would have changed the outcome. Notably, Defendant does not claim that he was not involved with Teters in distributing methamphetamine and laundering money. Nor does he claim he did not transport methamphetamine while on pretrial release. The Government correctly points out that "[i]t is not a defense that a person's participation in a conspiracy was minor or for a short period of time." Ninth Circuit Model Jury Instruction 11.4. Nonetheless, the Court did not take into consideration the large amount of drugs other tangential conspirators possessed and only considered the amount of drugs with which Defendant was directly involved. And whether Defendant's relationship with Teters was a friendly one or a cold, calculating business relationship had no bearing on the ultimate issues or sentencing in the case.

Furthermore, although Defendant argues defense counsel should have hired a fingerprint expert to show Defendant never handled the drugs he was found with at the Portland Airport, Defendant specifically admitted during his Change of Plea that he had 3,057 grams of methamphetamine in the Portland Airport, which he had obtained from Teters and which he intended to distribute in Portland. (Change of Plea Tr. 15:8–9; Plea Agreement § II.B, Count One ¶ 4.) There is a strong presumption that these statements Defendant made are true. *See United States v. Rubalcaba*, 811 F.2d 491, 494 (9th Cir. 1987) ("Solemn declarations in open court carry a strong presumption of verity.").

Defendant has failed to show either that his counsel failed to investigate or that any investigation would have changed the outcome of the proceedings. Hence, Defendant has failed to meet the *Strickland* test to establish ineffective assistance of counsel on this ground.

### C. Failure to Ensure Plea Was Knowing and Voluntary

Defendant next argues that "[c]ounsel erroneously told [him] that he would receive a sentence of five years or less if he signed the plea deal" and said he would receive fifteen years if he went to trial. (Motion at 24.) Furthermore, counsel waited too long before he began negotiating a deal with the Government, and, if counsel had "not sat on his proverbial hands, [defendant] would have received a much more lenient deal." (Motion at 25.)

Even assuming Defendant's representations are true and even if defense counsel's advice rises to the level of deficient performance, Defendant cannot meet the prejudice prong of *Strickland*. He does not argue that but for this error he would not have pled guilty and would have insisted on going to trial. Nor can he.

In his written plea agreement, which Defendant stated he had read in its entirely and had no questions about, Defendant admitted that he was facing at least ten years in custody on Counts One and Two and that he could receive up to ten years more, a sentence that must be served consecutively, because he committed Count Three while on pretrial release. (Plea Agreement § III.A; Change of Plea Tr. 7:15–22.) The Magistrate Judge reconveyed this information to Defendant, telling him in court again that he was facing ten years to life in custody on Counts One and Two and a mandatory additional maximum of ten years for Count Three. (Change of Plea Tr. 9:15–10:12.) Defendant said he understood what the Magistrate Judge was telling him and then proceeded to plead guilty, informing the Magistrate Judge that he was pleading guilty because he was guilty and for no other reason. (*Id.* 14:5–7.) Thus, Defendant knew the potential penalties, he knew the sentence was ultimately up to the judge, and he still chose to move forward with the guilty plea.

Defendant's argument that he would have gotten a better deal if his attorney had moved quicker is equally unavailing. *See Clark v. Lewis*, 1 F.3d 814, 823 (9th Cir. 1993) (reasoning pure speculation about what sort of plea offer the government might have made or accepted is insufficient to establish ineffective assistance of counsel when the defendant accepted the proffered deal with a full advisal of the consequences of accepting this plea offer).

Hence, Defendant has not shown that his counsel was ineffective by failing to ensure the plea was knowing and voluntary.

## III. CONCLUSION

Defendant has failed to demonstrate that his counsel's performance was either deficient or that, but for counsel's errors, the outcome would have been different. Because Defendant has failed to demonstrate any actual prejudice from the deficiencies he alleges, his Motion for Writ of Habeas Corpus and his Motion to Vacate his Conviction and Sentence pursuant to 28 U.S.C. § 2255 (ECF Nos. 1938, 1939) are both **DENIED**. The clerk is directed to close Case No. 22-cv-01171-BAS.

## IV. CERTIFICATE OF APPEALABILITY

A district court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the § 2255 movant. "A COA may issue 'only if the applicant has made a substantial showing of the denial of a constitutional right.'" *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (quoting 28 U.S.C. § 2253(c)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Id.* (quoting *Miller El v. Cockrell*, 537 U.S. 322, 327 (2003)).

//
//
//

Defendant's § 2255 filings do not meet this standard. His motions are without merit and his factual contentions are contradicted by the record before the Court. Accordingly, the Court declines to issue a certificate of appealability in this action.

**IT IS SO ORDERED.**

DATED: October 24, 2022

Hon. Cynthia Bashant
United States District Judge